Barbara HASWELL, Plaintiff,

v.

MARSHALL FIELD & CO. and Dayton Hudson Corporation, Defendants.

No. 97 C 4241.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 17, 1998.

---

**954**

William J. Burke, Demos & Burke, Chicago, IL, for Barbara Haswell, plaintiff.

Robert Johns Mignin, Staci S. Beck, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Marshall Field & Company, Dayton Hudson Corporation, defendants.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Barbara Haswell brought this two-count complaint against defendants Marshall Field & Co. and Dayton Hudson Corporation alleging employment discrimination under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111 *et seq.* ("ADA"), and intentional infliction of emotional distress ("IIED"). Haswell alleges that the defendants unlawfully terminated her based on a mental impairment that substantially limits one or more of her major life activities. Although Haswell signed a waiver saying that she would not sue the defendants for her termination, Haswell claims that the waiver is invalid because she did not sign it knowingly and voluntarily.

Currently before the Court is the defendants' motion for summary judgment. Defendants argue that they are entitled to summary judgment because Haswell's contractual release of claims against them is valid, and that even if it were not, Haswell cannot establish an ADA claim as a matter of law. Defendants also attack the IIED claim on the grounds that it is preempted under the Illinois Human Rights Act and, in the alternative, fails on the merits as a matter of law. For the reasons set forth below, the defendants's motion is granted in part and denied in part.

### I. BACKGROUND

The following undisputed facts are gleaned from the parties' Local General Rule 12 statements of material facts and accompanying exhibits.[1]

---

1. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no general issue." The movant's statements must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." The Defendant's statement shall be cited herein as "Def.'s Facts." Similarly, Local Rule 12(N)(3) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. The plaintiff's response shall be cited as "Pl's Facts."

### A. Haswell's Background and Her Employment at Marshall Field's

Barbara Haswell has a global brain impairment with an overall IQ in the Mentally Retarded range. (Pl's Facts ¶ 1). In grade school, Haswell was diagnosed as having a "speech-language disorder" and placed in a Special Education program for the "Educable Mentally Handicapped." (*Id.* ¶ 2). Despite her education, she cannot perform certain functions such as subtracting, reading and filling out a job application, driving a car, and understanding complex issues. (*Id.* ¶ 6–14). Haswell's husband is also mentally handicapped, and both depend on their families for help. (*Id.* ¶ 4).

In 1970, Haswell began her first job at Marshall Field & Co.'s Old Orchard store. (Pl's Facts ¶ 17). Throughout the years, Haswell's job duties consisted of washing uniforms and linens, bussing tables, washing dishes, making salads, and helping to set up serving lines. (*Id.*) By June 1994, Haswell had become a "prep cook," preparing salads in the Marketplace Deli of the Old Orchard store. (*Id.* ¶ 18).

In June 1994, Marshall Fields hired Joyce Clemens to manage the Marketplace Café and the Marketplace Deli at the Old Orchard store. (*Id.* ¶ 19). Clemens worked with two assistant managers: Gloria Mucha, who oversaw the Deli, and Tracy Kralik, who oversaw the Café. (Def. Facts ¶ 6). On January 20, 1995, Haswell received her first-ever negative performance review from her new supervisors, which indicated that she had productivity problems as a prep cook. (*Id.* ¶ 11). However, Mucha repeatedly counseled and coached Haswell until she was preparing salads at an acceptable rate. (*Id.* ¶ 12).

### B. Haswell's Transfer from the Deli to the Café

In October 1994, John Kalantonis, a dishwasher in the Café, underwent open-heart surgery. After four months of recuperation, Kalantonis returned to his job. (Pl's Facts ¶ 23). However, on January 21, 1996, Marshall Field terminated Kalantonis, creating a vacancy in the Café. (*Id.*) Marshall Fields transferred Haswell from her prep cook position in the Marketplace Deli to the vacant dishwasher position in the Marketplace Café.[2] (*Id.* ¶ 27). Joyce Clemens testified that Haswell was the logical choice to fill Kalantonis' position because: (1) Haswell had been filling in as a dishwasher since December 1995; (2) Haswell had previous experience working as a dishwasher; and (3) Clemens was exceeding her labor budget for the Deli and moving Haswell out of the Deli to the Café alleviated this problem. (Def. Facts ¶ 15).

### C. Decision to Close the Marketplace Café

On April 26, 1996, Fields announced that the Café would close on May 4, 1996, due to its continuing poor financial performance. Ten days after her transfer, Haswell learned that all the employees assigned to the Café (herself included) would be terminated effective June 15, 1996. (Pl's Facts ¶ 28). According to Haswell, Clemens was aware of the potential closing months before it was announced; she allegedly told Kalantonis that the restaurant would soon close when

---

Local Rule 12(N)(b) authorizes the nonmoving party to submit a statement of additional facts that require the denial of summary judgment; pursuant to Local Rule 12(M), the moving party may then submit a response to the non-moving party's additional facts. All properly supported material facts set forth in either party's statement (i.e., Def's Facts or Pl's Add'l Facts) are deemed admitted unless properly controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis*, 5 F.3d 1031 (7th Cir.1993). Moreover, the mere denial of a particular fact without specific reference to the affidavits, parts of the record, and other supporting materials that allegedly establish a factual dispute is insufficient; where a factual assertion is met with such a naked denial, the fact may be admitted. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1312 (7th Cir.1995).

2. Defendants claim that Kalantonis suffered a heart attack in March 1996 and vacated the dishwasher position, prompting Haswell's transfer. (Def. Facts ¶ 13, 14). Haswell, however, disputes the Defendants' belief in this stated reason for her transfer. Further, Haswell denies that Kalantonis suffered a heart attack in 1996. (Pl's Facts ¶ 23).

she terminated him in January 1996. Clemens also allegedly told Kathy McCarthy, Assistant Store Manager of Human Resources, that she thought the restaurant would close in either July 1996 or January 1997.[3] (*Id.* ¶ 30).

Immediately after the termination announcement, McCarthy and her assistant, Claudette Stevenson, held one-on-one meetings with each Café employee to distribute and discuss separation documents. (Def. Facts ¶ 26). They included the following: (1) an Agreement and Release; (2) a summary of benefits; (3) tax information; (4) a pension estimate; and (5) a card listing the date and time for the individual to either sign the Agreement or decline to sign it. (*Id.*) Haswell met with McCarthy and received the separation materials. The Agreement and Release stated, in pertinent part, that "in exchange for Marshall Field's having entered into this Agreement, Employee agrees to give up all Employee Claims against Marshall Field's as described above. Employee will not bring any lawsuits or make any other demands against Marshall Field's based on Employee claims." (*Id.* ¶ 57). In exchange for that promise, Haswell's Agreement and Release provided for a payment of $5,865.60, equivalent to 26 weeks of pay. (*Id.* ¶ 27). Her sign-out date was set for June 11, 1996 at 10:00 a.m. (*Id.* ¶ 28).

### D. *Assistance from Haswell's Sister-in-Law, Sarah Mott*

After Haswell was terminated, her father-in-law, Homer Haswell, contacted Sarah Mott, his daughter, to discuss Haswell's transfer to the Café dishroom. (Def. Facts ¶ 33). Mott is an attorney specializing in labor and employment law. (Def. Facts ¶ 31). After talking to Mott, Homer sent her copies of the Agreement that Haswell had received from McCarthy.[4] (*Id.*) After making some preliminary phone calls, Mott was left without an explanation as to why Haswell was transferred to the dishroom.[5] (Pl's Facts ¶ 32). Therefore, Mott had Haswell send her additional information, such as pay stubs. (Def. Facts ¶ 34). Mott knew that Haswell had received a definite date on which she either had to sign the Agreement or decline to sign it. (*Id.* ¶ 35).

Approximately one week after Mott received the information on Haswell's termination, she called McCarthy and told her that Haswell's payout was incorrect; it should have been calculated on the basis of a 37.5-hour work week schedule rather than a 30-hour weekly schedule. Mott noted that Haswell had generally worked 37.5 hours per week, and had worked a 30-hour schedule only the 10 days that she worked as a dishwasher. (*Id.* ¶ 36).

Mott also spoke with Tom Morrisroe, Regional Human Resource Manager, and told him that Haswell's payout amount was miscalculated. (*Id.* ¶ 37). Betty Kindness, Manager of Policy Planning and Employee Relations for the Department Store Division of Dayton Hudson Corporation, recalculated Haswell's payout on the basis of a 37.5-hour schedule and sent McCarthy a corrected version of the Agreement. (*Id.* ¶ 49). This corrected version provided for a payout of $7,478.25, in contrast to the original version calculated on a 30-hour basis, which provided for a payout of $5,865.60. (*Id.*)

Following her conversation with Morrisroe, Mott sent a letter on behalf of Haswell to Patricia Dirks, Senior Vice President of Human Resources for the Department Store

---

3. Defendants claim that Clemens did not know that the Café was going to close at the time that she decided to transfer Haswell. According to Defendants, John Lovelace, Vice President of the Department Store Division of Dayton Hudson Corporation, informed Clemens in February 1996 that the Café would remain open. (Def. Facts ¶ 17).

4. Defendant maintains that Mott acted as Haswell's attorney in reviewing the Agreement. (Def. Facts ¶ 31). But Haswell contends that Mott was simply helping her as her sister-in law

because Haswell could not understand the Agreement on her own. (Pl's. Facts ¶ 13).

5. Testimony from Fields' employees illustrates the confusion. When McCarthy asked Clemens in May 1996 about the reasons for Haswell's transfer, Clemens told her it was to replace Jorge Santoy, the dishwasher, who had been made a "line cook." (McCarthy Dep. 123). At her deposition, however, Clemens stated that the only reason for Haswell's transfer was that John Kalantonis had suffered a heart attack. (Clemens Dep. 56, 78; Pl's Facts ¶ 32).

Division of Dayton Hudson. (*Id.* ¶ 38). This letter alleged disability discrimination based on Haswell's abrupt termination, and requested corporate involvement in either securing Haswell another job at Marshall Fields or giving Haswell her old job back in the Deli. (*Id.*) Mott never spoke to Dirks, however. (*Id.* ¶ 39).

After the conversation with Mott in late April, McCarthy contacted Morrisroe to discuss Haswell's abrupt termination. (*Id.* ¶ 45). Morrisroe asked McCarthy to investigate the circumstances surrounding Haswell's transfer and to look for other possible positions for Haswell within the company. (*Id.*) McCarthy contacted John Banks and learned about an available 30-hour per week position in the food services area at the Marshall Field's State Street Store in Chicago, Illinois. (*Id.* ¶ 46). McCarthy told Haswell that if she was interested in the job at the State Street Store, she needed to fill out a request for transfer form. (*Id.* ¶ 49). However, Haswell did not fill out the application to transfer to the State Street Store because she had never traveled downtown by herself and doing so would have presented a safety problem. (Pl's Add'l Facts ¶ 47).

Approximately one week before Haswell's sign-out date, Mott received a voicemail from Paul Strickland, Director of Employee Relations for the Department Store Division of Dayton Hudson, stating that he would investigate the termination and would make sure that Haswell retained her job. (*Id.*) Mott left Strickland a return voicemail stating that she did not want Haswell to attend the sign-out meeting by herself. Then she told Haswell the meeting was canceled. (*Id.* ¶ 40, 41).

### E. *Haswell's Meeting with McCarthy*

On June 11, 1996, approximately 45 days after she was given the separation materials, Haswell nevertheless met with McCarthy. (Def. Facts ¶ 51). At this meeting, McCarthy explained to Haswell that she needed to sign the Agreement because McCarthy needed to send the signed agreements to Dayton Hudson headquarters in Minnesota. (*Id.* ¶ 52). Although Haswell indicated to McCarthy that she did not understand the Agreement, McCarthy insisted that Haswell should

sign it. (*Id.*) Haswell relented and signed the Agreement. (Pl's Add'l Facts ¶ 52).

Mott was not called to this meeting. (Pl's Facts ¶ 33). Haswell showed a copy of the Agreement to Homer Haswell about a week after it was signed. (Pl's Add'l Facts ¶ 56).

On August 14, 1996, Haswell filed a disability discrimination charge with the Illinois Department of Human Rights. (Def.Facts.¶ 59). On October 23, 1997, Haswell repaid to Marshall Field & Co. the $7,478.25 she had received in severance payments. (Pl's Add'l Facts ¶ 59).

## II. ANALYSIS

### A. *Summary Judgment Standards*

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150. But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material fact," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. 2505; *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. In an employment discrimination suit, where credibility and intent are crucial issues, these standards are ap-

plied with added rigor. *See Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994). We now address whether Haswell's claims survive summary judgment, beginning with her ADA claim.

### B. *The Jury Must Decide Whether Haswell Validly Waived Her ADA Claim*

▮ Alleged waivers of ADA claims are evaluated based on standards similar to waivers of claims under the Age Discrimination in Employment Act ("ADEA") because parallel policy rationales drove the enactment of both statutes. *Wisch v. Whirlpool Corp.*, 927 F.Supp. 1092, 1097 (N.D.Ill.1996). Therefore, we will analyze whether Haswell's release was executed "knowingly and voluntarily" using the 1990 amendments to the ADEA enacted in the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626.[6] In order for a person to waive his or her rights under these statutes,[7] he or she must do so knowingly and voluntarily. *Pierce v. Atchison, Topeka and Santa Fe Railway*, 110 F.3d 431, 433 (7th Cir.1997) (alleged ADEA waiver). The Seventh Circuit agrees with those courts that have held that the party seeking enforcement of the waiver has the burden of proving that consent was both voluntary and informed. *Id.* at 435.

Under the OWBPA, courts commonly test alleged waivers under a "federal totality of circumstances" approach that takes into account factors such as: (1) the employee's education and business experience; (2) the employee's input in negotiating the terms; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation prior to signing; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper employer conduct. *Pierce*, 65 F.3d 562, 571 (7th Cir.1995), *aff'g after remand*, 110 F.3d 431 (7th Cir.1997). The inquiry is fundamentally an examination waiving party's mental state. *Pierce*, 110 F.3d at 442.

Focusing on the sixth factor, defendants contend that Haswell's waiver was valid because she was represented by counsel—her sister-in-law, Sarah Mott—at the time she signed it. Defendants claim that Mott performed several duties of an attorney in connection with the Agreement and Release, including: 1) calling McCarthy about "miscalculating" Haswell's severance pay; 2) looking over the Release and Agreement; and 3) sending a letter on Haswell's behalf to Patricia Dirks, Senior VP of Human Resources. (Def. Facts ¶ 36, 33, 38). Further, defendants argue that Mott knew about the 45–day period to sign the Agreement, leaving her ample time to discuss with Haswell whether she should sign it. (*Id.* ¶ 50).

Defendants, however, ignore the remaining totality factors, many of which seriously call into question the validity of the release. Furthermore, genuine, material factual disputes permeate the representation-by-counsel issue.

First, Haswell and Mott testified in their depositions that Mott was not consulted as an attorney, but rather as a family member

---

**6.** Under Section 201 of the OWBPA, 29 U.S.C. § 626(f), an employee may not waive an ADEA claim unless the waiver is knowing and voluntary. *See Oubre v. Entergy Operations, Inc.*, —— U.S. ——, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (release did not bar employee's ADEA claims because it did not comply with OWBPA requirements). A waiver will not be considered knowing and voluntary "unless at a minimum" the following conditions are met: (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate; (B) the waiver specifically refers to rights or claims arising under this chapter; (C) the individual does not waive rights or claims that may arise after the date the waiver is executed; (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled; and (E) the individual is advised in writing to consult an attorney prior to executing the agreement. 29 U.S.C. § 626(f)(1).

**7.** We do not address the standards for waiver of Haswell's IIED claim because we dispose of it on other grounds, specifically, its preemption by the Illinois Human Rights Act.

who was attempting to determine the reasons for Haswell's abrupt transfer and termination from her long-term employment. (Mott Dep. 26–27; Haswell Dep. 75–76). Mott specifically stated in her letter to Patricia Dirks that she was not acting as Haswell's attorney. (Mott Dep. Ex. 1). Even McCarthy acknowledged that she did not know Mott was an attorney when she spoke with Mott. (McCarthy Dep. 83). Second, viewed in the light most favorable to Haswell, the evidence supports a finding that Mott never used her legal expertise to assist Haswell in understanding the Agreement. Paul Strickland assured Mott that Haswell would keep her job and that she would not have to go to the meeting to sign the Agreement. (Mott Dep. 49, 51, 65–66). Therefore, Mott assumed the meeting would not take place, and accordingly never reviewed the Agreement's substance with Haswell. (Mott Dep. 69, 86–87).

Even if Haswell were represented by counsel in connection with the Release and Agreement, the evidence on the other totality factors calls into question whether Haswell's release of claims against the defendants was knowing and voluntary. For example, the release may have been procured by improper employer conduct (factor 8). When Haswell met with McCarthy on ' her sign-out date, Mott was not summoned to the meeting. McCarthy then told Haswell that she needed to sign the Agreement. (Def. Facts ¶ 51, 52). Although Haswell indicated to McCarthy that she did not understand the Agreement, Haswell testified that felt forced into signing it. (Pl's Add'l Facts ¶ 52). Under these facts, a reasonable juror could find that Haswell did not sign the release in a knowing and voluntary fashion, regardless of whether Mott was technically acting as Haswell's attorney.

In addition, Haswell may not have even had the ability to read or understand the release, given her mental capacity and limited education and business experience (factor 1). (Pl's Facts ¶ 11–14). Dr. Morris, a neuropsychologist and Assistant Professor in the Departments of Psychiatry and Rehabilitation Medicine at Northwestern University Medical School, concluded that Haswell is not mentally capable of understanding the release or of making a knowing and voluntary decision whether to accept or reject the Agreement. (Morris Aff. 3). If she cannot subtract, read or fill out a job application, or understand complex issues, it is highly questionable that Haswell could have knowingly executed the release—which was couched in technical legal language—on her own. (Pl.'s Facts ¶¶ 6–14).

Under these circumstances, basic principles of contract law indicate that Haswell may elect to void the release. Justice Breyer's concurrence in the recently decided *Oubre v. Entergy Operations, Inc.,* —— U.S. ——, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), explains that if an employee signs a release under conditions that "would justify giving one of the parties a choice as to validity"— such as the employee's inability to understand the release—it is voidable at the employee's option. *See id.* at 843–44. In *Oubre,* the Court rejected the argument that an admittedly invalid release of ADEA claims can be "ratified" if the employee keeps the money she received as consideration for signing the release. *Id.* at 842. Justice Breyer wrote separately to point out that a nonconforming release does not render the agreement in which it appears void (without any legal effect), but rather voidable (giving the employee a choice about its validity). This prevents employers from ignoring their own reciprocal obligations under the agreement, such as paying benefits. *Id.* at 844. In determining whether a contract is voidable, Justice Breyer explained, courts "typically ask whether the contract has been made under conditions that would justify giving one of the parties a choice as to validity ... e.g., a contract with an infant." *Id.*

This Court finds that there is a material issue of fact as to whether the conditions surrounding Haswell's execution of the release justifies allowing her to avoid the waiver of ADA claims. Haswell's overall IQ is in the Mentally Retarded range. (Pl's Facts ¶ 1). She specifically told McCarthy that she "didn't really understand the release" and asked if she had to sign it that day. (Haswell Dep. 95–98, 101–102, 133). McCarthy told Haswell that she did. (*Id.*) Haswell

testified that she did not understand that she had a choice, and stated that she thought "if I didn't sign it, I wouldn't have a job." (Haswell Dep. 81–82, 98). Haswell also testified that if she had been given more time, she would not have signed the release, and that no one ever told her that she had seven days to change her mind. (Haswell Dep. 102–03, 108–08). Finally, it is undisputed that Mott did not know that Haswell had signed the release until several weeks later, beyond the period during which the agreement could be revoked. (Haswell Dep. 115–16).

A review of the evidence easily allows this Court to conclude that a material issue of fact exists as to whether Haswell knowingly and voluntarily signed the Release and Agreement, and whether it is voidable at her option based on the questionable circumstances surrounding execution. Therefore, we deny summary judgment to the defendants on their waiver defense. We next address the merits of Haswell's ADA claim.

### C. The McDonnell Douglas Approach Under the ADA

In order to survive a motion for summary judgment in an employment discrimination case, a plaintiff must set forth sufficient evidence to raise an inference of discrimination, which can be done in one of two ways. The first is by presenting enough evidence (whether direct or circumstantial) to raise a genuine issue as to whether the employer has a discriminatory motive in carrying out the challenged employment action. *Troupe v. May Dep't. Stores,* 20 F.3d 734, 736 (7th Cir.1994). The second is by employing the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Cowan v. Glenbrook Sec. Services, Inc.,* 123 F.3d 438, 445 (7th Cir.1997). Although *McDonnell–Douglas* involved a claim of discrimination under Title VII of the Civil Rights Act of 1964, the Seventh Circuit has applied the decision's burden-shifting framework to claims brought under other employment discrimination laws. *See Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir.1997) (applying the framework to a claim under ADA). In the instant case,

Haswell contends that she has presented indirect evidence under the *McDonnell–Douglas* approach sufficient to defeat the Defendant's motion for summary judgment.

■ To succeed on an ADA claim under the indirect method, the plaintiff must first establish a prima facie case to create a rebuttable presumption of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To state a prima facie case under the ADA, Haswell must demonstrate that: (1) she is "disabled" as that term is defined by the ADA; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the adverse action make it more likely than not she was subjected to it because of her disability. *Weigel,* 122 F.3d at 465.

■ If the plaintiff demonstrates a prima facie case, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer is successful, the presumption dissolves and the burden of production shifts back to the employee to prove that the employer's proffered reasons were merely a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Pretext may be shown by presenting evidence of one of the following: (1) the defendant's explanation had no basis in fact; (2) the explanation was not the "real" reason; or (3) the reason stated was insufficient to warrant the adverse employment action. *Hughes v. Brown,* 20 F.3d 745, 747 (7th Cir.1994). The plaintiff always retains the ultimate burden of showing that she was the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The defendants argue that Haswell cannot establish a prima facie case of disability discrimination on two grounds: (1) Haswell cannot show that she has a disability (the first prong) because her level of intellectual functioning is not "substantially limiting," and (2) she cannot demonstrate that her condition

more likely than not motivated her transfer (the fourth prong) because Clemens did not know about Haswell's intellectual capacity or that the Café was going to close when she transferred Haswell.

We find, however, that Haswell is a disabled person under the ADA. We also find that Haswell has raised an issue of fact as to Clemens' knowledge of Haswell's condition and about the Café's imminent closing at the time of Haswell's transfer. Because this latter issue involves the same evidence as the pretext inquiry (i.e., whether Haswell's transfer was a pretext for disability discrimination), these arguments are discussed together below.

### 1. Haswell is a disabled person under the ADA

In order to satisfy the first element of the prima facie case, Haswell must demonstrate that she suffers from a "disability" under the ADA.[8] The ADA defines "disability" as A) "a physical or mental impairment that substantially limits one or more of the [person's] major life activities"; B) a record of such an impairment; or C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). We hold that Haswell's limited mental capacity was a disability under subsection A. In light of this conclusion, we need not consider the applicability of subsections (B) or (C).

Our consideration of subsection (A)'s applicability proceeds in three steps. First, we consider whether Haswell's condition was a mental impairment. Second, we identify the life activities upon which Haswell relies (learning and caring for herself) and determine whether either of them constitutes a major life activity under the ADA. Finally, if Haswell satisfies these first two requirements, we ask whether her impairment substantially limited one of the identified major life activities. *Bragdon v. Abbott,* —— U.S. ——, ——, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998).

### a. Haswell has a mental impairment

■ The Department of Health, Education, and Welfare (HEW) has defined mental impairment as "any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 45 C.F.R. § 84.3(j)(2)(i)(1997). Based on this definition, Haswell clearly has a mental impairment for several reasons. First, Haswell has an overall IQ in the Mentally Retarded range. (Pl's Facts ¶ 1). Second, Dr. Morris testified that Haswell's vocabulary is markedly limited and her thinking is extremely slow. (Morris Aff.2). Third, it is undisputed that Haswell cannot perform certain functions such as subtracting, reading and filling out a job application, driving a car, and understanding complex issues. (Pl's Facts ¶ 6–14).

### b. Haswell's mental impairment substantially limits her major life activities of caring for herself and learning

■ The second step is to determine whether Haswell's mental impairment substantially limits her major life activities of caring for herself and learning. According to the EEOC, some examples of major life activities are caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *Weiler v. Household Finance Corp.,* 101 F.3d 519, 523 (7th Cir.1996) (citing EEOC regulations at 29 C.F.R. § 1630.2(j)). The parties do not dispute that learning and caring for oneself are considered major life activities under the ADA; thus, we will proceed directly to whether Haswell's mental impairment substantially limits her major life activities.

"Substantially limits" means that the person is either "unable to perform a major life function or is significantly restricted as to the condition, manner or duration" under which the individual can perform a particular major life function, as compared to the average person in the general population. 29 C.F.R.

---

8. The ADA prohibits discrimination against a "qualified individual with a disability." 42 U.S.C. § 12112(a). This is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

§ 1630.2(i). Whether a substantial limitation upon a major life activity exists depends upon an analysis of 1) the nature and severity of the impairment, 2) the duration of the impairment, and 3) the permanent or long-term impact of the impairment. *Id.*

Defendants focus on the first consideration, asserting that Haswell cannot demonstrate that she was substantially limited in the major life activities of learning or caring for herself because her impairment is not severe. Specifically, they contend that Haswell is not substantially limited in caring for herself because she lives with her husband in their own condominium and cares for them both. (Def. Facts ¶ 2). Defendants also maintain that Haswell is not substantially limited in learning because she was able to master new tasks at work after receiving counseling from supervisors and coworkers. (Def. Facts ¶ 12).

However, the evidence shows that Haswell experiences significant restrictions in comparison with the average person, especially in the realm of learning. Most notably, Haswell's grade school placement in a Special Education program for the "Educable Mentally Handicapped" demonstrates that educational specialists determined that she could not learn at the same rate as her peers. (Pl.'s Facts ¶ 2). And despite receiving this education, Haswell still cannot subtract, read and fill out a job application, drive a car, or understand complex issues—all tasks that the average person in the general population can perform. (*Id.* ¶ 6–14). In light of this evidence, the fact that Haswell was able to improve her salad preparation pace with her supervisor's assistance is of little relevance. Moreover, Haswell has at least raised a fact issue as to substantial limitations on her ability to care for herself. She and her husband are both mentally handicapped, and although they live alone, they depend on their families for help. (Pl's Facts ¶ 1) (Haswell Dep. 21–23). Haswell may flesh this out at trial by presenting evidence on the extent to which the couple depends on their families and the nature of the help they request.

But severity is not our only consideration—we must examine the duration and long-term impact of Haswell's impairment as well. Haswell's mental impairment is permanent, and it appears that she will experience its limitations throughout her entire life. Given the strength of the durational and long-term impact factors, any weaknesses on the severity factor wane in importance.

Based on the record, we find that Haswell's mental impairment substantially limits her ability to learn. We also conclude that the jury may decide whether Haswell's impairment substantially limits Haswell's ability to care for herself. Having met all three requirements for establishing a disability under the ADA, Haswell must now present sufficient evidence that she was a "qualified individual."

### 2. Haswell is a qualified individual under the ADA.

■ Under the ADA's "qualified individual" requirement, Haswell must show that she was a qualified individual with a disability at the time that Clemens transferred her to the Café and then terminated her. *Hoeller v. Eaton Corp.,* 149 F.3d 621, 624, 1998 WL 381439, at \*3 (7th Cir. July 10, 1998). This inquiry comprises two elements. First, Haswell must satisfy "the prerequisites for the position[,] such as possessing the appropriate educational background, employment experience, skills, licenses, etc." 29 C.F.R. § 1630.2(m). Second, she must be able to "perform the essential functions of the position held or desired with or with out reasonable accommodation." *Id.* Thus, Haswell must present evidence that in 1996, she possessed the necessary skills to perform her job and was "willing and able to demonstrate these skills by coming to work on a regular basis." *Nowak v. St. Rita High School,* 142 F.3d 999, 1003 (7th Cir.1998).

It is undisputed that Haswell possessed the requisite skills for the positions she held at Marshall Fields and that she was willing and able to demonstrate these skills by coming to work on a regular basis. Defendants challenge only Haswell's ability to perform the essential functions of the job with or without reasonable accommodation. Al-

though Haswell's January 20, 1995 performance review indicated that she had productivity problems as a prep cook, Gloria Mucha counseled and coached Haswell until she was preparing salads at an acceptable level. (Def. Facts ¶ 11, 12). Viewing this evidence in the light most favorable to Haswell, Mucha's coaching was a reasonable accommodation of Haswell's mental impairment that rendered Haswell able to perform the essential functions of her salad prep job. Furthermore, Haswell's employment record was otherwise unblemished. This one-time performance deficiency is insufficient to for this Court to find as a matter of law that Haswell was incapable of performing the essential functions of her job.

Because the defendants do not attack Haswell's qualifications and the record shows that Haswell adequately performed the essential functions of her position at Marshall Fields, we find that she is a qualified individual with a disability under the ADA. She is therefore entitled to the antidiscrimination protections of the Act. It is to the discrimination question that we now turn.

3. **There is a material issue of fact as to whether the defendants believed their proffered reasons for Haswell's transfer and termination, and whether these employment actions were instead based on her disability**

█ Next, we address whether Haswell has presented evidence on the fourth element of her prima facie case—that she was more likely than not transferred and subsequently terminated because of her disability. This inquiry overlaps with Haswell's burden to show pretext, i.e., to call into question the defendants' honest belief in their stated reasons for Haswell's transfer. Consequently, we analyze these two issues simultaneously.

In arguing that their reasons for transferring Haswell were both nondiscriminatory and honestly believed, defendants insist that Clemens did not know that Haswell was mentally retarded. In addition, defendants argue that Clemens did not know that the

Café was going to close when she transferred Haswell. On this point, defendants explain that the reason Haswell was transferred to the Café is that dishwasher John Kalantonis had a heart attack and Clemens needed someone to fill his position. (Def. Facts ¶ 13, 14). Clemens states that Haswell was the logical choice to fill Kalantonis' position because 1) Haswell had previous experience as a dishwasher; 2) Haswell had been performing the job as a dishwasher for several months already on an "as-needed" basis; and 3) Clemens was exceeding her labor budget for the Deli and moving Haswell out of the Deli to the Café would alleviate this problem. (Def. Facts ¶ 15).

But Haswell argues that Clemens' proffered reasons for transferring her to the Café ten days before it closed were phony. To support this contention, Haswell relies on several pieces of evidence. First, she points to the numerous, inconsistent reasons defendants gave for her transfer. Defendants currently claim that Haswell replaced Kalantonis in the Café dishroom because he suffered a heart attack in 1996. But Haswell disputes that Kalantonis had any heart problems in 1996. Although he underwent open-heart surgery in 1994, Kalantonis returned to his job after four months, and there is no evidence that he experienced debilitating heart problems thereafter. (Pl's Facts ¶ 23). In addition, Kalantonis stated in his affidavit that Clemens explained that he was being terminated because the Café was not doing well and would soon close—not because his heart condition left him unable to work. (*Id.*) In contradiction to all this evidence, McCarthy testified that when she asked Clemens in May 1996 about the reasons for the transfer, Clemens told her it was to replace a *different* employee—Jorge Santoy, the dishwasher, who had been made a "line cook." (McCarthy Dep. 123). Clemens also admitted to McCarthy that she thought the Café was going to close in July '96 or January '97. (Pl's Facts ¶ 31).

Second, Haswell points out that she was the only person transferred out of the Deli into the Café in April 1996, and that she was

not transferred pursuant to any corporate policy. If she had remained on the Deli payroll and did dishes on an as needed basis, as she had been previously doing, she would not have been part of the Cafe closure. Once a person is put on a particular department's payroll, Marshall Fields company policy dictates that the person must be eliminated when the rest of the department's employees are terminated. (Pecoraro Dep. 40–41). Therefore, transferring an employee to a financially troubled department like the Café is tantamount to a certain termination. And there is no corporate policy that required Haswell's full transfer to the Café payroll, as opposed to simply transferring her hours spent working there, as was done the previous four months.

This evidence undermines defendants' proffered explanations as the "real" reasons for Haswell's transfer. The irreconcilable inconsistencies in the defendants' employees' testimony, the suspicious timing, and the fact that Haswell was the only employee transferred—without any justification founded in corporate policy—sufficiently call into question the defendants' belief in their proffered reasons for transferring Haswell. And the fact that defendants claim Clemens, who managed both the Deli and the Café and was familiar with Haswell's performance in both departments, did not know Haswell was mentally retarded only adds to the disingenuousness. It should be up to a jury to decide whether Clemens' stated reasons for transferring Haswell to the Café a mere ten days before it closed were pretextual, and whether Haswell's transfer and termination were more likely than not based on her disability. We thus deny summary judgment for the defendants on Haswell's ADA claim.

### D. Haswell's Intentional Infliction of Emotional Distress Claim Is Preempted By The Illinois Human Rights Act

■ Haswell's second claim is a state-law tort action for intentional infliction of emotional distress ("IIED"). Defendants argue that the IIED count is preempted by the Illinois Human Rights Act ("IHRA") because it is "inextricably linked" to a claim for a "civil rights violation" under the IHRA and, therefore, must be dismissed by this Court.

■ The IHRA limits both state and federal court jurisdiction by removing from those courts' purview all "civil rights violations" covered by the Act. *Geise v. Phoenix Co. of Chicago*, 159 Ill.2d 507, 514–15, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1276 (1994). This means that if a state common-law claim is in essence one that seeks redress for a "civil rights violation" as defined by the Act, this Court lacks jurisdiction to adjudicate the claim. *Id.* at 516, 203 Ill.Dec. 454, 639 N.E.2d at 1276. A "civil rights violation" occurs, *inter alia*, when an employee is terminated on the basis of "unlawful discrimination." 775 ILCS 5/2–102. "Unlawful discrimination," in turn, includes "discrimination against a person because of his or her ... handicap." 775 ILCS 5/1–103.

■ The test for determining whether a claim is subject to IHRA preemption was clarified by the Illinois Supreme Court in *Geise v. Phoenix Co.* The pivotal question is whether the claim is "inextricably linked" to a civil rights violation. 159 Ill.2d at 516–17, 203 Ill.Dec. at 458, 639 N.E.2d at 1277. In *Geise*, the plaintiff alleged that she had suffered sexual harassment at the hands of her supervisor. She brought negligent hiring and negligent retention claims against her employer, contending that the company knew about this man's history and continuing perpetration of sexual harassment, but hired and retained him nevertheless. The court held that it lacked jurisdiction to consider these claims because IHRA preempted them. *Id.* at 515–18, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1276–78. It reasoned that "the concept of sexual harassment is inextricably linked to" the negligent hiring and retention claims. *Id.* at 516–17, 203 Ill.Dec. 454, 639 N.E.2d at 1277. "Absent the allegations of sexual harassment, Geise would have no independent basis for imposing liability on her former employer under the facts present here. Counts III and IV depend on the prohibi-

tions against sexual harassment for their viability." *Id.* at 517, 203 Ill.Dec. 454, 639 N.E.2d at 1277.

The same is true in this case. Similar to the negligent firing and retention counts in *Geise*, Haswell's IIED claim is inextricably linked to her employment discrimination claim. Haswell alleges IIED by claiming that at the time McCarthy coerced her into signing the release, defendants knew that Haswell (1) was mentally handicapped; (2) had difficulty communicating; (3) was "slow"; and (4) knew Haswell "would do anything asked of her." These same allegations surface in Haswell's disability discrimination claim. Thus, the emotional distress claim relies on the fact that Haswell was being discriminated against because of her mental impairment. Without the allegations of disability discrimination, Haswell would have no independent basis for imposing IIED liability on the defendants. In short, the IIED claim "depend[s] on the prohibitions" against disability discrimination for its viability. *Id.* at 517, 203 Ill.Dec. 454, 639 N.E.2d at 1277.

 Because Haswell's IIED claim must be construed as charging Marshall Field with a "civil rights violation" within the meaning of the IHRA, it is barred by section 8–111(c) of the Act.[9] Therefore, the IIED claim is dismissed for lack of subject matter jurisdiction.

## III. CONCLUSION

Haswell has the right to prove to a jury that she was discriminated against because of her mental impairment under the ADA for three reasons: (1) Haswell has provided sufficient evidence that she did not sign the waiver knowingly and voluntarily; (2) Haswell has established a prima facie case under the ADA and; (3) Haswell has established that there is a material issue of fact as to whether the reasons for her transfer were a pretext for disability discrimination. Therefore, this Court denies summary judgment on the first count.

However, the IHRA preempts Haswell's IIED claim because it is inextricably linked to her ADA claim. Therefore, this Court dismisses the second count for lack of jurisdiction. The parties are ordered to attend a status hearing at 9:15 a.m. on August 31, 1998 to set a fair and efficient schedule for trial on Haswell's ADA claim.

**9.** Even if the IIED claim were not preempted, Haswell has not presented evidence sufficient to sustain her IIED claim on the merits. Specifically, she has not proved the first element of the tort, that the defendants engaged in extreme and outrageous conduct. Extreme and outrageous conduct has been interpreted to mean that the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89, 4 Ill.Dec. 652, 360 N.E.2d 765, 767 (Ill.1976). Whether conduct is truly extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the case. *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir.1997). Courts have consistently held, however, that employment discrimination disputes do not establish extreme and outrageous conduct sufficient to sustain an IIED claim. *See Holmes v. Razo*, 1995 WL 444407, at *9 (N.D.Ill. July 18, 1995) ("The circumstances of a typical employment dispute, even a discrimination claim, generally do not rise to the level of extreme and outrageous conduct ...."); *see also Harriston v. Chicago Tribune*, 992 F.2d 697, 703 (7th Cir.1993) (African–American employee's allegations that she was not allowed to supervise white employees, was reprimanded for no reason, denied the receipt of certain benefits, forced out of management, falsely accused of poor performance, threatened with discipline, and excluded from social activities did not constitute extreme and outrageous conduct); *Van Stan*, 125 F.3d at 569 (employer's act of discharging plaintiff with bipolar disorder and providing an untrue reason for the discharge did not exceed all possible bounds of decency under an objective standard). The facts alleged in support of Haswell's IIED claim are no more egregious than the facts in the above cases; as such, her IIED claim fails for the independent reason that the defendants' conduct was not extreme and outrageous.